**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WILMINGTON DIVISION**

IN RE:

H6 COMPANY,                                        CASE NO.: 24-03976-5-DMW
                                                   CHAPTER 11
      DEBTOR(S)

| | | |
|---|---|---|
| H6 COMPANY | ) | |
| | ) | |
|       Plaintiff, | ) | |
| | ) | ADVERSARY PROCEEDING NO.: |
|   vs. | ) | |
| | ) | |
| ABSM LLC d/b/a | ) | |
| COASTAL DEBT RESOLVE, | ) | |
| | ) | |
|       Defendant. | ) | |

**COMPLAINT**

Plaintiff, H6 Company (hereinafter referred to as the "Plaintiff" or "Debtor"), complaining of ABSM LLC d/b/a Coastal Debt Resolve (hereinafter referred to as the "Defendant") hereby alleges and says as follows:

**PARTIES, JURISDICTION AND VENUE**

1.      H6 Company filed a petition under Chapter 11 of the Bankruptcy Code commencing the above captioned bankruptcy case on November 13, 2024 ("Petition Date"). In the petition, the Debtor elected to proceed under Subchapter V of Chapter. The Debtor operates as a "debtor-in-possession" (as defined by 11 U.S.C. § 1182(2)) and has the authority to prosecute this Adversary Proceeding pursuant to 11 U.S.C. § 1184.

1

2.    The Debtor is a limited liability company registered with the North Carolina Secretary of State and has a principal place of business in Brunswick County, North Carolina. Michael High is the President and sole owner of the Debtor.

3.    Upon information and belief, ABSM LLC d/b/a Coastal Debt Resolve is a limited liability company with a principal place of business located at 6750 N Andrews Ave, Ste. 150, Fort Lauderdale, FL 33309.

4.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §157 and §1334 and the Standing Order of Reference of the United States District Court for the Eastern District of North Carolina.

5.    This is a core proceeding under 28 U.S.C. § 157(b).

6.    Venue is appropriate in this Court pursuant to 28 U.S.C. §§ 1408 & 1409.

## GENERAL ALLEGATIONS

7.    Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 6 inclusive, as if more fully set forth at length herein.

8.    This is an action to avoid the incurrence of a constructively fraudulent obligation, and to avoid and recover certain transfers of property of the Debtor pursuant to §§ 548 and 550 of the Bankruptcy Code; and, Rule 7001 of the Bankruptcy Rules.

9.    H6 Company was incorporated in 2017. At the end of 2017, the Debtor purchased an existing custom home builder, Southern Comfort Homes, Inc. From

2017 through operations ceasing in April 2024, the Debtor built custom residential homes in Brunswick County, North Carolina. Michael High serves the President and sole shareholder of the Debtor.

10.    The Debtor operated profitably and grew its sales until the onset of the coronavirus pandemic in 2020.

11.    In mid-2020, the price of lumber, among other housing inputs, increased by over 250%. This substantial increase in lumber prices caused the Debtor's fixed price contracts to become unprofitable.

12.    In mid-2020, to maintain its operations, the Debtor took out the first of many merchant cash advances ("MCA"). This one MCA eventually snowballed into 5 by early 2024.

13.    To help rework payments with its five outstanding MCAs, the Debtor contacted the Defendant. According to the Defendant's website: "We've perfected our proven process to get over 1,000 businesses out of MCA debt. We craft customized solutions for each client to get the best results" https://www.coastaldebt.com/ (last visited December 12, 2024).

14.    In an agreement dated March 5, 2024, Mr. High signed a contract with the Defendant to try and help restructure the five outstanding MCA agreements totaling approximately $750,000.00 in debt (the "Agreement"). A copy of the Agreement is attached hereto as **Exhibit A**.

15.    According to the Agreement, Defendant was to be paid a retainer fee of $75,021.95, plus a dispensation fee of $150,043.91.

3

16.    According to the estimations of the Defendant, the Debtor would be saving $202,559.27. This was compared to the $225,065.86 that the Defendant would be paid in fees.

17.    Beginning February 16, 2024, Plaintiff paid Defendant, via ACH, $7,117.33 each week for 3 weeks. This was followed by $9,086.82 each week for 4 weeks.

18.    On April 15, 2024, needing money for its operations, the Plaintiff requested a refund of monies paid to the Defendant. Defendant refused to refund any monies to the Plaintiff.

19.    To date, Plaintiff has paid Defendant a total of $57,699.27.

20.    To date, Defendant has not negotiated any settlements with Plaintiff's MCAs. Nor has Defendant disbursed any monies paid by Plaintiff to parties other than itself.

21.    In consideration for receiving $57,699.27, Defendant has done nothing to benefit the Plaintiff.

22.    The Debtor was insolvent at the time of the agreement with Defendant, and all dates between the time of the agreement and the Petition Date. As reflected on the Debtor's Chapter 11 schedules, the assets of the Debtor total no more than $152,000.00. The only change in assets between March 2024 and now is the sale of a $1,500.00 piece of equipment.

23.     As reflected in the agreement with the Defendant, the liabilities of the Debtor were at least $750,000. In fact at the time of the Agreement, the liabilities of the Debtor were closer to the $2,800,000.00 listed in the Chapter 11 schedules.

24.     The amounts, dates, and other details regarding the payments that the Debtor made to the Defendant are set forth in the table attached hereto as **Exhibit B** (the "Transfers"). The Transfers were made each week between February 16, 2024 and April 5, 2024 with the Defendant initiating ACH debits from the Debtor's Bank of America bank account ending in XXXX-3891.

25.     Each of the Transfers constituted a transfer of an interest of the Debtor in the property transferred.

26.     At the time of the Transfers, the total amount owed by the Debtor to its creditors exceeded the value of its assets.

27.     At the time of the Transfers and continuing through the Petition Date, the Debtor failed to pay its debts as they came due.

28.     The Debtor was insolvent at the time of the Transfers.

**FIRST CLAIM FOR RELIEF**
(Avoidance of Fraudulent Obligation & Transfers – 11 U.S.C. § 548(a)(1)(B))

29.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 28 inclusive, as if more fully set forth at length herein.

30.     The Debtor did not receive reasonably equivalent value in entering into the Agreement. In consideration for payments of $225,065.86 to the Defendant, the Debtor would only be saving $202,559.27. Moreover, the Defendant would not be setting aside sufficient money to pay to the Debtor's creditors until it received

payment of $225,065.86 (this would only start 7 months after the agreement was entered into).

31.     The Debtor, additionally, did not receive reasonably equivalent value in exchange for the Transfers.

32.     The Debtor received no tangible benefits from the alleged services of the Defendant.

33.     In consideration for not receiving anything of value, the Debtor paid $57,699.27 to the Defendant.

34.     At the time of the Transfers, the Debtor was insolvent.

35.     The Debtor is entitled to avoid the incurrence of the Agreement, and to avoid the $57,699.27 in Transfers pursuant to 11 U.S.C. §§ 548(a)(1)(B).

### SECOND CLAIM FOR RELIEF
(Recovery of Avoided Transfers – 11 U.S.C. § 550(a))

36.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 35 inclusive, as if more fully set forth at length herein.

37.     Defendant received $57,699.27 in transfers avoidable under 11 U.S.C. § 548(a)(1). Defendant was the initial transferee of the avoidable transfers it received from the Debtor. The avoidable transfers made to Defendant were for the benefit of Defendant.

38.     Plaintiff seeks a judgment against Defendant in the amount of the avoidable transfers received under 11 U.S.C. § 548, plus pre-judgment interest at the legal rate until judgment is entered.

6

WHEREFORE, Plaintiff prays that the Court grant the following relief:

A.    To avoid the incurrence of the Agreement and avoid the fraudulent transfers the Debtor made to Defendant in the two years before the Petition Date under 11 U.S.C. § 548(a)(1)(B);

B.    To enter judgment in favor of Plaintiff against Defendant under 11 U.S.C. § 550(a) in the amount of the avoided transfers Defendant received, $57,699.27;

C.    To award pre-judgment and post-judgment interest at the maximum legal rate until paid in full, with such recovery being for the benefit of the Debtor's estate;

D.    To tax the costs of this action against the Defendant; and,

E.    For such other and further relief the Court deems just and proper.

Respectfully submitted, this the 20th day of December, 2024.

RICHARD P. COOK, PLLC

/s/ Richard P. Cook
Richard P. Cook
Attorney for Plaintiff(s)
N.C. State Bar No. 37614
7036 Wrightsville Ave, Suite 101
Wilmington, NC 28409
Telephone: (910) 399-3458
Email: Richard@CapeFearDebtRelief.com

# EXHIBIT A

**COASTAL ▶ Debt**

RESOLVE

6750 N. Andrews Ave, Ste. 150, Fort Lauderdale, Florida 33309

# BUSINESS DEBT RESOLUTION AND SETTLEMENT AGREEMENT

This Business Debt Resolution and Settlement Agreement including all documents contained herein and Incorporated now by reference, (hereinafter the "Agreement"), is made by and between ABSM LLC d/b/a COASTAL DEBT RESOLVE ("Company" or "Coastal Debt Resolve" or "us" or "we") located at 6750 N Andrews Ave, Ste. 150, Fort Lauderdale, FL 33309 and H6 Systems Inc. ("Client" or "you") with its principal place of business located at 4701 Southport-Supply Road Southeast STE 1, Southport, North Carolina 28461 United States. This Agreement will not be effective until Company receives a properly signed copy of all required documents from you. This date on which this occurs shall be referred to as the "Effective Date." You may sign or initial this Agreement manually or electronically.

## 1. COMPANY RESPONSIBILITIES

**1a. Confirmation of Debt:** You have informed us that your business is currently struggling with debt that cannot be sustained and is entirely unaffordable in the long term. You have confirmed that the debt at issue is solely business debt, and not personal or consumer debt. Accordingly, we have committed to work in good faith to resolve each of the debts listed in the Schedule of Enrolled Debts.

**1b. Response Time:** We will respond within a commercially reasonable time to all your inquiries and communications.

**1c. Progress**: We will strive to keep you reasonably well informed of Company efforts on your behalf and advise you if we become aware of any significant changes in creditor policies or other factors that may materially affect the good faith estimates we have made about the timing or amount of any settlement.

**1d. Duration of Program**: We have estimated a length of __11__ months will be sufficient to fully resolve your debts, however, the actual length of your program may vary depending upon such factors as: (1) your regular deposits into your dedicated settlement account, as described in more detail below; and (2) your creditors' willingness to settle your debts.

**1e. Verification of Enrolled Debt**: The enrolled debts listed in the Schedule of Enrolled Debts may not reflect the actual amounts owed to each of your creditors because of accrued interest, late fees, penalty fees, attorney's fees, collection costs, incorrectly reported or under reported debt by Client, etc. We may, in Company's sole discretion, contact your creditors to verify the exact amount of debt owed as of the Effective Date. If we determine that the amount of debt owed to any creditor on the Effective Date differs from the amount of debt as set forth in the Schedule of Enrolled Debts, you agree that the amount shall be deemed restated to reflect the actual amount of your debt as of the Effective Date, with the newly verified amount of debt in place and governing retroactively as if it had appeared thereon from the execution of this Agreement.

## 2. YOUR RESPONSIBILITIES

**2a. Respond Promptly and Honestly:** You agree to respond promptly and honestly to all Company requests and assist us as necessary to verify your Enrolled Debt. You further agree to notify us immediately if any of your contact information should change or if you receive a settlement offer directly from one of your creditors. If we notify you of a potential settlement offer, you agree to consider it promptly and in good faith.

**2b. Program Deposits:** Beginning on 3/3/2024, you will pay your first program payment in the amount of $7,117 from your primary bank account into a dedicated FDIC-insured account ("Settlement Account") established with Secured Account Service ("SAS"). The Settlement Account shall be for the exclusive purpose of collecting funds for settlement payments, Company fees, Legal Plan fees, and administrative fees. You will always own and control the Settlement Account,

DocuSign Envelope ID: 98893954-1E6B-44E6-907A-F48F123398C9

the account terms and conditions of which will be set forth in a separate agreement between you and the dedicated account administrator. The total of these payments reflects the sum of the Company's fees, the Legal Plan fees, the administrative fees, and the amount estimated to be used settling the Enrolled Debts with the creditors. These program payments are detailed in the "Program Payment Schedule" on page 7 of this Agreement.

**2c. Your Representations, Agreements & Acknowledgements:** By your execution of this Agreement, you are representing to us, and acknowledging your understanding of, the following matters:

**Unsecured Business Debt:** Each of the Enrolled Debts is unsecured business debt, and owed by your business(es) to the listed creditor(s) in the amount listed on the Schedule of Enrolled Debts. If Company discovers an enrolled Debt is secured or is a consumer/personal debt, such Debt will be unenrolled and removed from the program without any liability on the part of Company.

**No Assumption of Debt or Monthly Payments Made on Your Behalf:** You acknowledge that we are not liable for and will not assume any debt on your behalf, or make monthly payments to your creditors.

**Additional Loans:** You agree not to incur any additional loans or business debt after the Effective Date. This Agreement covers only the obligations listed in the Schedule of Enrolled Debts.

**Effects of Participation in a Debt Resolution Program:** Failing to make your minimum monthly payments to the Creditors may be breaking the terms of agreements with the Creditors, and (a) will likely adversely affect your creditworthiness, credit report, and credit score, and (b) may lead creditors to increase finance charges, add late fees, and pursue litigation or other legal collection actions. Any such creditor contact should be referred to Company. Forgiveness or cancellation of some or all Debt, and the amount of such forgiveness or cancellation may have tax consequences and should be brought to the attention of a tax professional. Company does not provide you with tax advice and you should consult with a professional tax advisor about the consequences of debt forgiveness.

**2d. Advice Rendered:** You agree that we do not provide legal, tax, or bankruptcy advice.

**2e. Enrollment in Legal Plan:** A material part of this program is that Client agrees contemporaneously with execution of this Agreement to enroll in membership with the Citadel Business Legal Plan or comparable Legal Plan approved by the Company that will assist providing Client an attorney to defend Client's business(es) during the pendency of the Business Debt Settlement Program in the event legal proceedings are instituted against Client's business(es).

## 3. RESOLUTION OF YOUR DEBT

**3a. Settlement Offers:** We have structured the payments into your Settlement Account to reflect 43% of the debt enrolled as enumerated in the attached Schedule of Enrolled Debts. We will usually, however, begin making negotiated settlement offers to your creditors once the amount in your settlement account represents 20% of each debt.

**3b. Responding**: Accordingly, we often make more than one offer before securing a settlement. Once a settlement offer is obtained, we will contact you to confirm your acceptance. It is critical that you make yourself available to respond to our communications regarding proposed settlements.

DocuSign Envelope ID: 98893954-1E6B-44E6-907A-F48F123398C9

## 4. FEES

**4a. Fee Detail:** Company charges a dispensation fee of <u>20%</u> of the amount of each debt on the Effective Date as reflected in the Schedule of Enrolled Debts, a <u>10%</u> retainer fee and a weekly administrative account maintenance fee of <u>$55.00</u>. This administrative maintenance fee is not included in the <u>20%</u> dispensation fee, and will not be used toward payments to creditors. Similarly, fees paid to SAS are separately charged by SAS, are not included in the fees paid to Company, and will not be used to pay your creditors. Note that pursuant to the terms of this Agreement, the total of the payments into your dedicated Settlement Account represents <u>73%</u> of the debt you have enrolled as enumerated in the Schedule of Enrolled Debts. This is broken out as follows: <u>20%</u> (Dispensation fees) and <u>43%</u> (amount estimated to settle all debts in the Schedule of Enrolled Debts), <u>10%</u> retainer fee for a total of <u>73%.</u> The dispensation fees payable to Company is collected and paid over the first half of your Program Duration as measured in Paragraph 1d, with the remainder of all payments accumulating in your dedicated Settlement Account for paying settled debts. You understand and agree that the fees due to Company are due and payable on each debt enrolled in the Schedule of Enrolled Debt even if a creditor offers to settle any such debt directly with you. If you directly negotiate with, enter a settlement agreement with, make payment to, or withdraw a creditor from this Program, Company shall be entitled to a fee of <u>20%</u> of the balance then owing to that creditor, and the creditor shall be immediately removed from the Program.

**4b. Direct Debit Authorization:** You expressly authorize debits to be made from your Settlement Account for paying Company's fees as calculated and set forth in the preceding paragraph.

Per the terms of this Agreement, you authorize fee payments to Company from Client's Settlement Account in accordance with the provisions set forth above. Client understands that such debits will be for the payment of Company's fees in connection with the resolution of Client's debts. This authority will remain in effect until all debts are settled or the final payment of any earned but unpaid settlement fees owing to Company are paid.

## 5. TERMINATION

If you fail to make any payment required by this Agreement, fail to approve a settlement that we believe in good faith is in your best interests, fail to cooperate with Company or breach the terms of this Agreement, fail to discharge any of your obligations, or for other good and sufficient cause, we have the right to terminate this Agreement upon written notice (which may be electronic) to you, without any further obligation of Company due or liability to you.

## 6. ADDITIONAL PROGRAM PROVISIONS

**6a. Governing Law:** Unless otherwise set forth herein or required by the law of your state, this Agreement shall be governed by and construed in accordance with the laws of the State of Florida.

**6b. Severability and Waiver**: If any provision of this Agreement is found to be invalid or unenforceable, the remainder of this Agreement shall not be affected and the remaining terms will continue in effect and be binding on the parties, if such holding of invalidity or unenforceability does not materially affect the essence of this Agreement. The failure of either of us at any time to enforce any provision of or any right under this Agreement will in no way be construed to be a waiver of such provisions or rights, nor shall the failure of either of us to exercise any rights or options under this Agreement preclude or prejudice the exercising of such rights or any other rights under this Agreement or in any way affect the validity of this Agreement.

**6c. Notice**: Any notice or demand which is required or provided to be given under this Agreement shall be deemed to have been given and received for all purposes when delivered by hand, emailed, or sent via U.S. mail, FedEx, UPS, or courier service to the person or entity and at the address given in the first paragraph of this Agreement.

**6d. Assignment**: You may not assign or transfer any of your rights or obligations under this Agreement, and any attempt to assign or transfer such rights or obligations will be null and void. We may assign this Agreement without your consent.

**6e. Complete Agreement; Modification and Amendment of Terms**: This Agreement represents our complete and exclusive statement of our mutual understandings and supersedes all previous written and oral agreements and communications relating to the terms of our relationship. Other than as set forth herein, this Agreement may only be modified or amended by a writing signed by both of us. No verbal promises including any of performance have been made or agreed to by the parties other than stated herein.

DocuSign Envelope ID: 98893954-1E6B-44E6-907A-E48F123398C9

**6f. Indemnification and Hold Harmless.** Client hereby agrees to defend and hold harmless Company and any supporting servicers and consultants from and against any claims and liability of any nature whatsoever arising out of or about Client's failure to timely provide requested information to Company, Client's lack of authority or ability to complete terms of this Agreement, and all other claims arising out of this Agreement or relating to Client's debts and other financial obligations. This Agreement constitutes the entire agreement between the parties. Company makes no warranty, express or implied, as to the fitness of any recommendation it may make to Client arising out of this Agreement. Except for cause, Client unconditionally waives any right of action against Company, its officers, directors, employees, agents, brokers and assignees, at law, equity, or any other cause of action for any reason, directly, indirectly, or proximately believed to arise out of this Agreement, for any damages of any nature whatsoever that Client may incur by reason of Client following any recommendation of Company or Client's failure to follow any recommendation of Company, whether any singular, concurrent, or series of recommendations are acted upon or not acted upon in whole or in part by Client. This section shall survive any termination of this Agreement.

**6g. Limitations on Damages.** Liability under this Agreement or under any theory of liability regarding any claim by the Client is limited to the amount of fees paid by Client pursuant to this Agreement and received by Company. The Parties agree to be contractually bound to such limitation on any damages and agree not to demand or attempt to recover any amount in excess of such. It is the express intent of the parties to be bound by these limitations and this section shall survive any termination.

**6h. Information Authorization.** Client hereby authorizes Company to verify past and present bank accounts and any other asset balances from Client that are needed to provide the Company's services. Importantly, this Agreement does not provide any form of credit repair, credit score or D&B enhancement, or legal or tax advice, so any information obtained by Company cannot be used for those purposes.

**6i. Electronic and Voice Communication Consent**. Client consents to do business electronically with Company. Client understands that electronic transactions, not limited to emails, are inherently unsecure and that both Client and Company will take all reasonable steps to maintain the Privacy of the information shared between the parties. Client consents to receive information and documents relating to this Agreement and present and future Company services via electronic  mail,  text message,  facsimile, telephone communication, voicemail, prerecorded and autodialed messages, and any other common electronic and communication means. Client understands that all costs associated with the receipt, review, and use of such communications shall be those of Client, such as maintaining access to the Internet or paying for text messages or voice calls. Client and the undersigned person who signs this Agreement consent to receive updates and documents relating to this Agreement and the services and programs offered by Company via prerecorded voice messages, telephone calls, text/SMS messages, and/or using an automated dialing system. Client may contact Company at any time to opt-out of receiving updates, telephone calls, emails, text messages, and prerecorded and autodialed messages, and other Company communications. Consent to this section does not bind Client to any future purchases of new services or offers. Client consents to the monitoring and recording of all calls with the Company and its representatives.

**6j. Privacy**: It is the policy of the Company to maintain the privacy and confidentiality of all Client documents, data, and information unless such are needed to be shared or disclosed with third parties to effectuate or provide the services called for in this Agreement, or to respond to lawful process. The Company maintains electronic and physical safeguards over all Client information. The Company may, in its sole discretion, use the information provided to identify and offer additional services or products to the Client through itself or third parties, including amliated businesses, and Client consents to receive communications per the terms of provision 6i of this Agreement.

DocuSign Envelope ID: 98893954-1E6B-44E6-907A-F48F123398C9

## 7. DISPUTE RESOLUTION BY BINDING ARBITRATION          Client Initials: _MH_

**7a. Arbitration and Choice of Law:** This Agreement shall be governed by the laws of the State of Florida, without regard to any Conflict of Law provisions thereunder. In the event of any controversy, claim, or dispute between the parties arising out of or relating to this Agreement, the parties agree to resolve all issues solely using binding Arbitration, governed by the rules of the American Arbitration Association ("AAA") or other mutually agreeable neutral party. Any such Arbitration shall take place in Broward County, Florida and shall be conducted by a mutually agreed upon Arbitrator. If the parties are unable to agree to the selection of the Arbitrator, the AAA shall have the power to make the appointment from among other members of the National roster without the submission of additional lists. The arbitrator shall be neutral, independent, and shall comply with the AAA code of ethics. The arbitrator shall have the exclusive and sole authority to resolve any dispute relating to this Agreement including but not limited to interpretation, applicability, enforceability, breach, conscionability, or formation of this Agreement and of this arbitration requirement. The award rendered by the Arbitrator shall be final, binding on all parties, and not challengeable or subject to vacation or modification. Judgment on the award made by the Arbitrator may be entered into any court having jurisdiction over the parties. If either party fails to comply with the Arbitrator's award, the injured party may petition the Court of Broward County, Florida for enforcement. The parties further agree that either party may bring claims against the other only in his, her, or its individual capacity and not as a Plaintiff or class member in any purported class action or representative proceeding. Further, the parties agree that the Arbitrator may not consolidate proceedings of more than one person's claims, and may not otherwise preside over any form of representative or class proceeding. The parties shall share the cost of Arbitration (excluding attorneys' fees) equally. If a party fails to proceed with Arbitration, unsuccessfully challenges the Arbitrator's award, or fails to comply with the Arbitrator's award, the other party shall be entitled to costs of suit, including reasonable attorneys' fees for having to compel Arbitration or defend or enforce the award. This section and the arbitration requirement shall survive termination.

**7b. Class Action Waiver:** The parties hereto waive any right to assert any claims against the other party as a representative or member in any class or representation action, except where such waiver is prohibited by law against public policy. To the extent either party is permitted by law or court of law to proceed with a class or representative action against the other, the parties hereby agree that: (1) The prevailing party shall not be entitled to recover attorneys' fees or costs associated with pursuing the class or representative action (not withstanding any other provision in this agreement); and (2) The party who initiates or participates as a member of the class will not submit a claim or otherwise participate in any recovery secured through the class or representative action.

I represent that I have read, understand and agree to be bound by the terms of this Business Debt Resolution and Settlement Agreement as set forth above and in the documents Incorporated in this Agreement. I further acknowledge that the terms and conditions of this Agreement have been explained to my satisfaction by a representative of Coastal Debt Resolve and that I have no unanswered questions about the program or this Agreement.

Agreed to this ___5___ day of __March, 2024__

by Client:

*Michael High*
DocuSigned by:
C5018319EF5642D...

Print Name:  Michael High _____

for Company:

*Michael High*
DocuSigned by:
C5018319EF5642D...

Print Name:  Michael High _____


## SCHEDULE OF ENROLLED DEBTS

| ACCOUNT NUMBER | CREDITOR NAME | DEBT BALANCE |
|---|---|---|
| TBD | OnDeck | $124,742.60 |
| TBD | LG Funding | $84,346.80 |
| TBD | LG Funding | $118,440.00 |
| TBD | Sampson | $233,357.13 |
| TBD | Forward Financing | $189,333.00 |

## EXHIBIT A

| | |
|---|---|
| CLIENT NAME | Michael High |
| TOTAL DEBT | $750,219.53 |
| ESTIMATED SETTLEMENT (43%) | $322,594.40 |
| RETAINER FEE (10%) | $75,021.95 |
| DISPENSATION FEE (20%) | $150,043.91 |
| TOTAL AMOUNT WITH FEES (73%) | $547,660.26 |
| ESTIMATED AMOUNT YOU SAVE (27%) | $202,559.27 |
| PAYMENT SCHEDULE | Weekly |
| ESTIMATED BALANCE NEEDED FOR SETTLEMENT (73%) | $547,660.26 |
| DOWN PAYMENT | 0 |
| ESTIMATED BALANCE AFTER DOWN PAYMENT | $547,660.26 |
| TOTAL WEEKLY PAYMENT | $9,281.34 |

## PROGRAM PAYMENT SCHEDULE

| DATE | AMOUNT | RETAINER FEE | PROGRAM FEE | SERVICE FEE | ESCROW AMOUNT |
|---|---|---|---|---|---|
| 2/16/2024 | $7,117.33 | $7,117.33 | $0.00 | $0.00 | $0.00 |
| 2/23/2024 | $7,117.33 | $7,117.33 | $0.00 | $0.00 | $0.00 |
| 2/23/2024 | $7,117.33 | $7,117.33 | $0.00 | $0.00 | $0.00 |
| 3/8/2024 | $9,086.82 | $9,086.82 | $0.00 | $0.00 | $0.00 |
| 3/15/2024 | $9,086.82 | $9,086.82 | $0.00 | $0.00 | $0.00 |
| 3/22/2024 | $9,086.82 | $9,086.82 | $0.00 | $0.00 | $0.00 |
| 3/29/2024 | $9,086.82 | $9,086.82 | $0.00 | $0.00 | $0.00 |
| 4/5/2024 | $9,086.82 | $9,086.82 | $0.00 | $0.00 | $0.00 |

| 4/12/2024 | $9,085.86 | $8,235.86 | $0.00 | $0.00 | $850.00 |
| 4/19/2024 | $9,281.34 | $0.00 | $6,460.19 | $55.00 | $2,766.15 |
| 4/26/2024 | $9,281.34 | $0.00 | $6,453.19 | $55.00 | $2,773.15 |
| 5/3/2024 | $9,281.34 | $0.00 | $6,456.34 | $55.00 | $2,770.00 |
| 5/10/2024 | $9,281.34 | $0.00 | $6,456.34 | $55.00 | $2,770.00 |
| 5/17/2024 | $9,281.34 | $0.00 | $6,456.34 | $55.00 | $2,770.00 |
| 5/24/2024 | $9,281.34 | $0.00 | $6,456.34 | $55.00 | $2,770.00 |
| 5/31/2024 | $9,281.34 | $0.00 | $6,456.34 | $55.00 | $2,770.00 |
| 6/7/2024 | $9,281.34 | $0.00 | $6,455.81 | $55.00 | $2,770.53 |
| 6/14/2024 | $9,281.34 | $0.00 | $6,455.81 | $55.00 | $2,770.53 |
| 6/21/2024 | $9,281.34 | $0.00 | $6,455.81 | $55.00 | $2,770.53 |
| 6/28/2024 | $9,281.34 | $0.00 | $6,455.81 | $55.00 | $2,770.53 |
| 7/5/2024 | $9,281.34 | $0.00 | $6,455.81 | $55.00 | $2,770.53 |
| 7/12/2024 | $9,281.34 | $0.00 | $6,455.81 | $55.00 | $2,770.53 |
| 7/19/2024 | $9,281.34 | $0.00 | $6,455.81 | $55.00 | $2,770.53 |
| 7/26/2024 | $9,281.34 | $0.00 | $6,455.81 | $55.00 | $2,770.53 |
| 8/2/2024 | $9,281.34 | $0.00 | $6,456.34 | $55.00 | $2,770.00 |
| 8/9/2024 | $9,281.34 | $0.00 | $6,456.34 | $55.00 | $2,770.00 |
| 8/16/2024 | $9,281.34 | $0.00 | $6,456.34 | $55.00 | $2,770.00 |
| 8/23/2024 | $9,281.34 | $0.00 | $6,456.34 | $55.00 | $2,770.00 |
| 8/30/2024 | $9,281.34 | $0.00 | $6,456.34 | $55.00 | $2,770.00 |
| 9/6/2024 | $9,281.34 | $0.00 | $6,455.81 | $55.00 | $2,770.53 |
| 9/13/2024 | $9,281.34 | $0.00 | $6,455.81 | $55.00 | $2,770.53 |
| 9/20/2024 | $9,281.34 | $0.00 | $6,455.81 | $55.00 | $2,770.53 |

| 9/27/2024 | $9,281.34 | $0.00 | $1,553.22 | $55.00 | $7,673.12 |
|---|---|---|---|---|---|
| 10/4/2024 | $9,281.34 | $0.00 | $0.00 | $55.00 | $9,226.34 |
| 10/11/2024 | $9,281.34 | $0.00 | $0.00 | $55.00 | $9,226.34 |
| 10/18/2024 | $9,281.34 | $0.00 | $0.00 | $55.00 | $9,226.34 |
| 10/25/2024 | $9,281.34 | $0.00 | $0.00 | $55.00 | $9,226.34 |
| 11/1/2024 | $9,281.34 | $0.00 | $0.00 | $55.00 | $9,226.34 |
| 11/8/2024 | $9,281.34 | $0.00 | $0.00 | $55.00 | $9,226.34 |
| 11/15/2024 | $9,281.34 | $0.00 | $0.00 | $55.00 | $9,226.34 |
| 11/22/2024 | $9,281.34 | $0.00 | $0.00 | $55.00 | $9,226.34 |
| 11/29/2024 | $9,281.34 | $0.00 | $0.00 | $55.00 | $9,226.34 |
| 12/6/2024 | $9,281.34 | $0.00 | $0.00 | $55.00 | $9,226.34 |
| 12/13/2024 | $9,281.34 | $0.00 | $0.00 | $55.00 | $9,226.34 |
| 12/20/2024 | $9,281.34 | $0.00 | $0.00 | $55.00 | $9,226.34 |
| 12/27/2024 | $9,281.34 | $0.00 | $0.00 | $55.00 | $9,226.34 |
| 1/3/2025 | $9,281.34 | $0.00 | $0.00 | $55.00 | $9,226.34 |
| 1/10/2025 | $9,281.34 | $0.00 | $0.00 | $55.00 | $9,226.34 |
| 1/17/2025 | $9,281.34 | $0.00 | $0.00 | $55.00 | $9,226.34 |
| 1/24/2025 | $9,281.34 | $0.00 | $0.00 | $55.00 | $9,226.34 |
| 1/31/2025 | $9,281.34 | $0.00 | $0.00 | $55.00 | $9,226.34 |
| 2/7/2025 | $9,281.34 | $0.00 | $0.00 | $55.00 | $9,226.34 |
| 2/14/2025 | $9,281.34 | $0.00 | $0.00 | $55.00 | $9,226.34 |
| 2/21/2025 | $9,281.34 | $0.00 | $0.00 | $55.00 | $9,226.34 |
| 2/28/2025 | $9,281.34 | $0.00 | $0.00 | $55.00 | $9,226.34 |
| 3/7/2025 | $9,281.34 | $0.00 | $0.00 | $55.00 | $9,226.34 |

| 3/14/2025 | $9,281.34 | $0.00 | $0.00 | $55.00 | $9,226.34 |
| 3/21/2025 | $9,281.34 | $0.00 | $0.00 | $55.00 | $9,226.34 |
| 3/28/2025 | $9,281.34 | $0.00 | $0.00 | $55.00 | $9,226.34 |
| 4/4/2025 | $9,281.34 | $0.00 | $0.00 | $55.00 | $9,226.34 |
| **TOTALS** | **$549,220.29** | **$75,021.95** | **$150,043.91** | **$2,805.00** | **$320,304.43** |

# LIMITED POWER OF ATTORNEY

**STATE OF**        North Carolina

**COUNTY OF**      United States                    **KNOW ALL MEN BY THESE PRESENTS**

## PERMISSION LETTER FOR COASTAL DEBT RESOLVE
## TO COMMUNICATE WITH CREDITORS

THAT I, Michael High, of  United States Country, NC, with a principal place of business at Southport North Carolina,  on this the day of 3/5/2024, do hereby make, constitute, and appoint ABSM LLC d/b/a Coastal Debt Resolve ("Coastal Debt Resolve"), its agents, and representatives as my true and lawful Attorney–in–Fact with full power to communicate with my creditors for the purpose of assisting Company in carrying out its obligations pursuant to our agreement. I understand and agree that this Limited Power of Attorney does not represent an engagement of Coastal Debt Resolve for legal services, nor does it expand the scope of Coastal Debt Resolve's obligations under our Business Debt Resolution Agreement. It is solely to permit Coastal Debt Resolve to communicate with my creditors, to whom I understand and agree I remain primarily obligated.

As such, I instruct and authorize Coastal Debt Resolve:

1.  To the full extent that I am permitted, myself, to do so, communicate with banks, creditors, financial institutions, licensed collection agencies, and all other related entities and individuals relating to my debts and the specific obligations that Coastal Debt Resolve has undertaken pursuant to my Agreement therewith. A copy of this document is as legally effective as the original.

2.  Obtain records, debt validations, and supporting documents for the debts allegedly owed on my behalf.

3.  Communicate, negotiate, and settle debts with my permission, if I have met all my obligations under the Business Debt Resolution Agreement. I assert that all the information that I have provided and will provide the Company is accurate, timely, and correct.

4.  I understand and agree that Coastal Debt Resolve is not authorized, nor will I request or accept, any legal advice relating to my personal or business financial situation. All communications between my creditors, the parties listed above, and Coastal Debt Resolve are with my express permission and instruction. I understand that Coastal Debt Resolve is not a law firm, is not licensed to practice law or provide legal advice, and I expressly agree to waive, forgo, indemnify, and defend any claim against Coastal Debt Resolve relating to the practice of law. I understand that any creditor or collection activity, demands, or lawsuits are unrelated to my enrollment in the Company program, and would likely occur regardless of my participation in the Program because I and/or my businesses are already in default or cannot pay the creditor obligations. My participation in the Program will not serve to delay, defend, or reduce those lawsuits and the Program is solely a savings and negotiation Program (as described in Agreement), not related to any creditor actions.

**Signed:**   *Michael High*
DocuSigned by:
C5018319EF5642D...

**Printed Name:**   Michael High

DocuSign Envelope ID: 498893954-1E6B-4AE6-907A-F48F123398C9



**TRUST ACCOUNTING AGREEMENT
AND DISCLOSURE STATEMENT**

**Secure Account Service LLC, an Arizona limited liability company ("SAS") agrees to act as an independent third-party account administrator for the parties to this Agreement pursuant to the terms expressed herein. By accepting this Agreement and designating Secure Account Service as the independent account administrator, the parties hereto mutually agree to the following terms and conditions:**

**SCOPE OF SERVICES**. Secure Account Service shall collect and disburse funds as authorized by the undersigned Client in the underlying Agreement (the "Contract") between the Client and the Referring Company ("RC"), a copy of which will be provided to Secure Account Service, and providing related transactional accounting of Client's funds and/or accounts as described herein. Payment for Secure Account Service's processing fees shall be a part of the Contract and agreed upon by the signing parties to the Contract. The duties and responsibilities of Secure Account Service are limited to those expressly set forth in this Agreement. No party shall have the right to change or modify this Agreement unless agreed upon in writing by all parties.

SAS will provide 24/7 online access to both parties to view all transactions, deposits and disbursements related to the contract. SAS will process deposits and disbursements through ACH or EFT for all transactions. Paper drafts electronically processed by our financial institution that are returned for any reason will be resubmitted electronically by SAS, as directed. Parties to the contract will have account reporting and history available to them for download via CSV files from our site. Customer service representatives will be available at our toll-free number 1–866–845–8309, during business hours 8–4, Monday through Friday, for any type of account assistance.

**TRUST ACCOUNT(S)/LOCKBOX(S**). Client's funds will be deposited, held in and disbursed from an FDIC–insured trust account(s) at a U.S. banking institution(s) of SAS's choice. Client acknowledges the funds held in SAS's trust accounts(s) shall not bear interest, and are insured only to the FDIC limits established by governmental authorities and existing at the time of loss. Client agrees SAS may receive earnings credits related to the trust account(s) to offset certain banking charges and those credits shall inure entirely to the benefit of SAS, with no obligation to pass them along to the client.

**COMMUNICATIONS.** Client agrees to all communications, disclosures or required statements or receipts for any account activity related to this Agreement shall be distributed by electronic mail or via SAS's website. Client understands standard, unencrypted electronic mail comes with certain risks of detection or interception during transit or reception. Client assumes this risk and agrees SAS may communicate with Client information related to its account through electronic means. Client affirms it is able to electronically receive, download and print such disclosures, communications and statements or receipts. Upon Client's request, SAS will provide paper copies of all statements, communications and disclosures are available upon request.

**DISBURSEMENTS.** By signing this Agreement, Client authorizes and directs SAS to automatically disburse regular monthly payments to the RC according to the terms of the Client's RC Contract and/or settlement letter, without additional notification. Any changes to the instructions as outlined in the RC's Contract must be received in writing five (5) business days prior to scheduled payments. If Client wishes to decline to payment and/or disbursement from Client's account, Client must notify SAS within twenty–four (24) hours from the scheduled payment, otherwise the payment and/or disbursement will be deemed to be approved by Client and will be disbursed according to the Client's RC Contract and/or settlement letter; Client may not thereafter revoke approval. If Client declines to disburse payment and/or disbursement arranged be RC or creditor, Client understands there could be a charge to Client's debt program with RC. Client should contact its RC immediately for information.



**TRUST ACCOUNTING AGREEMENT AND DISCLOSURE STATEMENT**

**LIMITATION OF LIABILITY**. SAS is not a party to the Agreement between Client and RC, and SAS does not participate in any underlying debt negotiations. All questions regarding Client's debt program should be directed to the RC. Client understands it is under no obligation to open an account with SAS as part of Client's debt program. Client acknowledges and understands SAS makes no representations as to the RC's compliance with any state and/or federal laws. SAS shall not be responsible or liable for the sufficiency, accuracy, correctness of the Contract, its execution or manner of execution, or validity. SAS nor any service provider to SAS shall not be liable for failing to complete a transaction if the Client does not have sufficient, immediately available and good funds in its account to complete the transaction, or if any circumstance beyond SAS's control prevents the completion of the transaction, including without limitation the acts or omissions of any ACH, check or other processor, the National Automated Clearing House Association, the Federal Reserve System, or any bank, or the directive of any regulatory agency, or in any respect on account of the identity, authority, or rights of the persons executing or delivering, or purporting to execute or deliver, any paper, instrument or document. It is agreed and understood by the parties hereto that SAS will not be called upon to construe any contract or instrument deposited herewith. As a controlling part of the consideration for the acceptance of this Agreement, it is agreed that SAS shall not be liable for any of its acts or omissions done in good faith, nor shall it be liable for any claims, demands, losses or damages made, claimed or suffered by any party to this Agreement, excepting such as may arise through or be caused by SAS's grossnegligence. Client agrees that SAS's liability shall be limited to actual damages attributed to an act of gross negligence by SAS and/or its employees and Client hereby waives recovery of any consequential, special, exemplary or punitive damages in connection with any claim it may have against SAS.

**INDEMNIFICATION**. The undersigned parties to this Agreement hereby jointly and severally promise and agree to indemnify and hold harmless SAS and its subsidiaries, officers, directors, agents, partners, employees and attorneys from and against any loss, liabilities, damages, costs or expenses, judgments, attorney's fees, or other obligations of any kind, including any third–party demands, claims or actions, which SAS may incur or suffer in connection with or arising out of this Agreement or the Contract, except such as may be caused by SAS's gross negligence. The undersigned parties further agree to defend SAS at their own expense against all demands, claims or actions brought by any third–parties in connection with this Agreement or the Contract. SAS is hereby given a lien and a contractual right to set off upon and against all rights, titles and interests of each of the parties to the Agreement in all processing money, property, paper, instruments, documents and all monies arising therefrom to protect SAS's rights to indemnification and reimbursement under this Agreement. This right to set off may be exercised at SAS's sole option without notice to the parties hereto or any party interested in this Agreement.

**INTERPLEADER AND DUTY TO DEFEND**. In the event any conflict or controversy arises concerning this Agreement or any conflicting demands are made upon SAS arising out of or relating to this Agreement, the parties hereto expressly agree and consent that SAS shall have the absolute right at its sole option to either (a) withhold all money or documents deposited herewith and stop all further performance of this Agreement until a mutual agreement has been reached between all parties hereto, or (b) initiate an interpleader action to cause the parties to interplead and litigate their several claims and rights amongst themselves. In the event SAS files an interpleader action, or in the event any party interested in this Agreement files an action against SAS, SAS shall be fully released and discharged from all obligations imposed upon it in this Agreement. In the event a suit is brought by or against SAS, the parties to this Agreement jointly and severally agree to pay SAS all costs, expenses and reasonable attorney's fees which it may expend or incur in such action.

**CONTINUITY OF AGREEMENT**. This Agreement shall be binding on all parties hereto, their heirs, legal representatives, successors and assigns.



**TRUST ACCOUNTING AGREEMENT**
**AND DISCLOSURE STATEMENT**

**CHOICE OF LAW AND VENUE.** All disputes or controversies arising from this Agreement, or related thereto, shall be governed by the laws of the State of Arizona. The appropriate venue for adjudication shall be Mohave County, Arizona. In the event of any conflict between the terms of this Agreement and the Contract, with regard to venue, the venue specified in the Contract shall be controlling.

**BINDING ARBITRATION.** Client agrees any dispute or claim arising out of this Agreement or otherwise related to SAS's services to Client shall be resolved through binding arbitration with the American Arbitration Association or another qualified arbitrator agreed upon by the parties, and the decision or the arbitrator shall be final and enforceable by a court of competent jurisdiction.

**ATTORNEYS' FEES AND COSTS.** Client agrees that the successful party to any action between SAS and Client shall be entitled to the recovery of its reasonable attorneys' fees and costs.

**FEES. Client agrees to pay SAS for its services and authorizes SAS to debit Client's designated bank account or credit card, in addition to any other amounts Client has authorized, for the payment of SAS's below-stated fees and charges as they become due. SAS's monthly service charge will be deemed earned in full on the first day Client's account is opened and on the first day of each calendar month thereafter during which the account is open. No monthly fee or recurring charge will be prorated, regardless of what day of the month Client's account is opened or closed. All other charges will be deemed earned at the time of the transaction or event that gives rise to the charge. Fees are subject to change after providing client with notice thirty (30) days in advance.**

| | | |
|---|---|---|
| Account Set-Up $10.00 | Returned / Declined Items $10.00 | Settlement (Single Pmt) $10.00 |
| Monthly Service $15.00 | Returned (Disputed Items) $25.00 | Settlement (Multiple Pmts) $5.00 |
| Schedule Changes $10.00 | Stop Payment Fee $40.00 | Overnight Delivery $25.00 |
| Wire Transfer (Incoming & Outgoing) $50.00 | | |

| | | | |
|---|---|---|---|
| High | Michael | ▇▇▇▇▇▇▇ | ▇▇▇▇▇▇ |
| Last Name | First Name | Social Security Number | Date of Birth |
| | | | |
| Last Name | First Name | Social Security Number | Date of Birth |
| 4701 Southport-Supply Road Southeast STE 1 | | | |
| Street Address | | Home Phone # | Cell Phone # |
| Southport | NC    28461 | ▇▇▇▇▇▇▇▇▇▇ | |
| City | State    Zip | Email address (REQUIRED) | |
| Company:    H6 Systems Inc. | | Contact #:    ▇▇▇▇▇▇ | |

**DESIGNATED BANK ACCOUNT DEBIT AUTHORIZATION (Payment Option A)**

| | |
|---|---|
| Bank of America | ▇▇▇▇▇▇▇ |
| Bank Name | Bank Routing Number (As it appears on the check) |
| Michael High | ▇▇▇▇▇▇▇ |
| Name as it appears on bank account | Bank Account Number   [X] Checking   [ ] Savings |



**TRUST ACCOUNTING AGREEMENT
AND DISCLOSURE STATEMENT**

| DEBIT SCHEDULE AUTHORIZATION | | | | | |
|---|---|---|---|---|---|
| Deposit Amount | $7,117.33 | Start Date | 2/16/2024 | Number of Payments | 7 |
| Deposit Amount | $7,117.34 | Start Date | 4/5/2024 | Number of Payments | 1 |
| Deposit Amount | $7,534.86 | Start Date | 4/12/2024 | Number of Payments | 47 |

I authorize Secure Account Service (SAS) to debit and disburse funds according to the contacts provided by me or on my behalf or as otherwise provided by this agreement. This authorization is to remain in force until the schedule of debits is completed or until SAS has received written notification of a change or termination, allowing SAS no fewer than five (5) business days to act. SAS may discontinue this service at its discretion after providing written notice thirty (30) days in advance. SAS shall not be required to provide advance notice when advance notice is impossible. SAS shall not be liable to any person for not completing a transaction as a result of any limit on my designated bank account or if a financial institution fails to honor any debit from such account. I understand it is my responsibility to notify SAS immediately if a scheduled transaction does not occur. I authorize SAS to recover funds in the event of an error or in the event that a prior debit is returned for any reason.

**I have read and understand the information contained in this document and I affirm that the above information given by me is accurate and true to the best of my knowledge.**

SIGNATURE

DocuSigned by:

*Michael High*

C5018319EF5642D...

DATED    3/6/2024

# EXHIBIT  B

**H6 Company**
**CASE NO. 24-03976-5-DMW**

| Transferee: | **ABSM LLC d/b/a Coastal Debt Resolve** |
| Account: | **Bank of America ****3891** |

| Transfer Date | Transfer Amt. |
|---|---|
| 02/16/24 | $  7,117.33 |
| 02/23/24 | $  7,117.33 |
| 03/01/24 | $  7,117.33 |
| 03/08/24 | $  9,086.82 |
| 03/25/24 | $  9,086.82 |
| 03/29/24 | $  9,086.82 |
| 04/05/24 | $  9,086.82 |

$  **57,699.27**